WELDON F. OSBORNE AND ELEANOR W. OSBORNE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2376–65.   Filed November 24, 1970.

*William L. Taylor, Jr.*, for the petitioners.
*Vallie C. Brooks*, for the respondent.

ATKINS, *Judge:* Respondent determined deficiencies in income tax for the taxable years 1960 and 1961 in the respective amounts of $22,913.59 and $31,396.39.

The parties having settled certain issues by stipulation, the issues remaining for decision are whether the election of East Gate Center, Inc., to be treated as a small business corporation under subchapter S of the Internal Revenue Code of 1954 was terminated under section 1372(e)(5) of the Code with the result that petitioners are not entitled to deduct any part of such corporation's net operating losses, and, if not, the amounts of such corporation's net operating losses for its taxable years ended May 31, 1960 and 1961, and the adjusted basis at the end of such years of the petitioners' stock in the corporation and of any indebtedness of the corporation to them.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioners are husband and wife and at the time they filed their petition herein resided in Chattanooga, Tenn. For each of the taxable years 1960 and 1961 they filed a joint Federal income tax return with the district director of internal revenue, Nashville, Tenn., wherein they reported their income on the cash method of accounting.

Petitioner Weldon F. Osborne owned a large tract of land adjacent to the city of Chattanooga, Tenn. On June 4, 1956, the petitioners organized East Gate Center, Inc., under the laws of Tennessee for the purpose of building and operating a shopping center on such property. The capital stock of East Gate Center, Inc., hereinafter referred to

as East Gate, at all material times consisted of 10 shares of common stock which were owned equally by petitioners, each having received 5 shares at a cost of $500.

During 1957 East Gate had various market surveys and architectural layouts prepared with respect to the shopping center and began soliciting prospective tenants. At that time it was anticipated that the center would be opened for operation sometime during 1959.

To the north of the site for the proposed center was Brainerd Road which was a Federal highway and major artery between the downtown area of Chattanooga and Knoxville, Tenn. However, the land between the proposed center site and Brainerd Road was owned by Independent Enterprises, Inc., an unrelated corporation. This corporation was also planning to develop a shopping center on its property. The petitioner owned a 50-foot-wide accessway to Brainerd Road which was located to the east of the land owned by Independent Enterprises, Inc. In June 1957, in order to obtain another accessway to Brainerd Road, East Gate purchased four residential lots located to the west of the land owned by Independent Enterprises, Inc. Two of the lots were vacant. Moderately priced houses had been constructed on the other two lots and the houses were occupied when they were acquired by East Gate. At the time the lots were acquired East Gate intended to raze the two houses and construct an access road to Brainerd Road.

East Gate's development of the shopping center was delayed by actions of the State Highway Commission with respect to a proposed expressway to be located to the south of petitioner's property. Prior to final determinations with respect to the route to be followed by the expressway and the necessary right-of-way to be condemned, the State Highway Commission would not allow any construction in the area in which petitioner's property was located. Because of this delay, East Gate did not raze the two houses as intended. Instead, it permitted the occupants to continue to rent the houses, rather than evict them.

In July 1960, the right-of-way for the expressway was established and the necessary land was condemned. At some time not disclosed in the record East Gate reached an agreement with Independent Enterprises, Inc., under which East Gate was permitted access to Brainerd Road over the property owned by Independent Enterprises, Inc. Such agreement obviated the necessity of constructing an access road over the four residential lots acquired by East Gate in June 1957. Actual construction of the shopping center was commenced in 1964.

For its taxable year ended May 31, 1958, East Gate filed a Federal income tax return on Form 1120 with the district director of internal revenue at Nashville. On November 15, 1958, East Gate filed with such district director an election to be treated as a "small business corpora-

tion," together with stockholder consents. For each of its taxable years ended May 31, 1959, 1960, and 1961, East Gate filed a Federal income tax return on Form 1120–S with the district director at Nashville. For its taxable year ended May 31, 1962, East Gate filed a return on Form 1120 with such district director. In all its returns East Gate reported its income on an accrual method of accounting.

For its taxable years ended May 31, 1958 through 1962, East Gate reported gross income as follows:

| Years ended May 31— | Rents [1] | Discounts earned | Gross income |
|---|---|---|---|
| 1958 | $1,533.50 | $0.68 | $1,534.18 |
| 1959 [2] | 1,681.60 | | 1,681.60 |
| 1960 | 1,696.48 | | 1,696.48 |
| 1961 | 1,760.00 | 728.03 | 2,488.03 |
| 1962 | 1,721.92 | | 1,721.92 |

[1] Represents receipts from the rental of the two houses acquired in June 1957.
[2] In its return for the taxable year ended May 31, 1959, East Gate reported that it had a net operating loss o $8,253.87 which the petitioners shared equally.

On their joint return for the taxable year 1960 each of the petitioners claimed a deduction in the amount of $9,086.98 purporting to represent his share of a net operating loss suffered by East Gate in its taxable year ended May 31, 1960. In the notice of deficiency, respondent determined that the net operating loss of East Gate for its taxable year ended May 31, 1960, was in the amount of $14,121.97 of which petitioner Weldon F. Osborne's proportionate share was $7,060.99, but that such amount was not deductible by him because East Gate's election to be treated as a small business corporation under subchapter S of the Code was terminated in its taxable year ended May 31, 1960, because of its receipt of rents in such year in excess of 20 percent of its gross receipts for such year. He determined that the petitioner Eleanor W. Osborne's proportionate share of such net operating loss was $7,060.98, but that such amount was not deductible by her because East Gate's election pursuant to subchapter S of the Code was terminated as described hereinabove, and because the adjusted basis of her stock in East Gate was zero.[1]

On their joint return for the taxable year 1961, each of the petitioners claimed a deduction in the amount of $12,410.17, purporting to represent his share of a net operating loss suffered by East Gate in its taxable year ended May 31, 1961. In the notice of deficiency the

[1] At the trial and on brief the respondent contended that due to the net operating loss of East Gate for its taxable year ended May 31, 1959, both petitioners had exhausted their basis in the stock, that there was no indebtedness of the corporation to the petitioners and that for this alternative reason neither petitioner is entitled to deduct for his taxable year 1960 any portion of any net operating loss of East Gate for its taxable year ended May 31, 1960. On brief, the petitioner Eleanor W. Osborne concedes that for this reason she is not entitled to deduct for either 1960 or 1961 any portion of any net operating loss of East Gate.

respondent determined that the net operating loss of East Gate for its taxable year ended May 31, 1961, was in the amount of $14,952.39 of which petitioner Weldon F. Osborne's proportionate share was $7,476.20, but that such amount was not deductible by him because East Gate's election to be treated as a small business corporation under subchapter S of the Code was terminated in its taxable year ended May 31, 1961, or in an earlier taxable year, because of its receipt of rents in excess of 20 percent of its gross receipts for such year. He determined that petitioner Eleanor W. Osborne's proportionate share of such net operating loss was $7,476.19, but that such amount was not deductible by her because East Gate's election pursuant to subchapter S of the Code was terminated as described hereinabove, and because the adjusted basis of her stock in East Gate was zero.

## OPINION

The primary issue presented is whether East Gate's election to be treated as a small business corporation under subchapter S of the Code was terminated under section 1372(e) (5) of the Code [2] by its receipt of rents in its taxable years ended May 31, 1960 and 1961, in excess of 20 percent of its gross receipts for such years.

Petitioners concede that East Gate's receipt of rents in its taxable years ended May 31, 1960 and 1961, exceeded 20 percent of its gross receipts for such years. However, they contend, in effect, that the purpose of Congress in enacting section 1372(e) (5) was to deny the beneficial tax treatment of subchapter S to corporations which do not engage in an active trade or business, that East Gate was prevented from commencing its business by the actions of the State Highway Commission, that the receipt of the rent by East Gate was attributable to the delay, and that to deny subchapter S treatment to East Gate under these circumstances would reach a result contrary to the congressional intent.

We cannot accept this view. Section 1372(e) (5), as it existed in the years in question, unequivocally provided that, if, as is true here, more than 20 percent of the corporation's gross receipts is derived from the specified sources, which includes rents, the corporation's election not to be subject to the taxes imposed by chapter 1 of the Code shall

---

[a] As applicable to the years before us sec. 1372(e) (5) provided as follows:

PERSONAL HOLDING COMPANY INCOME.—An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

terminate. *Temple N. Joyce*, 42 T.C. 628. See also *Max Feingold*, 49 T.C. 461; *Bramlette Building Corp.*, 52 T.C. 200, affd. (C.A. 5) 424 F. 2d 751; and *Lansing Broadcasting Co.*, 52 T.C. 299, affd. (C.A. 6) 427 F. 2d 1014.

In support of their position, the petitioners point to the fact that section 1372(e)(5) was amended by Pub. L. 89–389, 80 Stat. 111 (Apr. 14, 1966), to provide that the 20-percent limitation on the receipt of passive investment income shall not apply to the first taxable year in which the corporation commences the active conduct of any trade or business or the next succeeding taxable year.[3] They contend that such provision indicates that in its original enactment of section 1372(e)(5) Congress did not intend to deny subchapter S treatment to a corporation which "inadvertently receives passive investment income in excess of the limitation" before such corporation is able to commence the active conduct of its trade or business.

A reference to the congressional committee reports [4] with respect

[3] Sec. 1372(e)(5), as so amended, provides as follows:

(5) PASSIVE INVESTMENT INCOME.—

(A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

(B) Subparagraph (A) shall not apply with respect to a taxable year in which a small business corporation has gross receipts more than 20 percent of which is passive investment income, if—

(i) such taxable year is the first taxable year in which the corporation commenced the active conduct of any trade or business or the next succeeding taxable year; and

(ii) the amount of passive investment income for such taxable year is less than $3,000.

(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom).

[4] H. Rept. No. 1238, 89th Cong., 2d Sess., p. 8; and S. Rept. No. 1007, 89th Cong., 2d Sess., pp. 8–9. H. Rept. No 1238 provides:

"When the 'passthrough' type of tax treatment was provided for corporations, Congress decided to limit the availability of this treatment to small businesses actively engaged in trades or businesses. Therefore, it denied this treatment to corporations with large amounts of passive income. Accordingly, present law (sec. 1372(e)(5)) provides that a 'passthrough' election is to terminate automatically where more than 20 percent of a corporation's gross receipts are derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities. To prevent a corporation from electing in and out of the 'passthrough' status, present law (sec. 1372(f)) also provides that generally where a corporation terminates its 'passthrough' election, it may not again elect this status until after the lapse of a 5-year period.

"Your committee's attention has been called to a type of instance, which may well occur with some frequency, where the provisions described above work unintended hardships. New corporations, electing the 'passthrough' treatment and intending to commence the operation of businesses, frequently have to improve real property and acquire tangible personal property before they can actually begin operations. Because of construction delays, or delays in obtaining the tangible personal property, the corporations may not produce the anticipated operating receipts in their first or second year of operation. Meanwhile, funds accumulated to pay the costs of construction (or the purchase price for the

to the amendment of section 1372(e)(5) shows that Congress was concerned about the denial of subchapter S treatment to corporations which, in the first 2 years of operations, were in receipt of passive investment income in excess of the 20-percent limitation because such corporations had not yet reached the point where they were generating gross receipts from their operations to sufficiently offset their receipt of passive investment income. It recognized that such was the effect of section 1372(e)(5) as it then existed. Accordingly, section 1372(e)(5) as amended was made retroactive, but its retroactivity was limited to taxable years beginning after 1962, and then only upon the election of the corporation and the consents of its shareholders.[5] Clearly then, the amended section does not apply to the taxable years of East Gate with which we are concerned, namely, the taxable years ended May 31, 1960 and 1961, and we, of course, express no opinion as to whether such taxable years would constitute East Gate's first taxable year in which it "commenced the active conduct of any trade or business" and the next succeeding taxable year within the contemplation of the section as amended. Nor can we conclude that the amendment made by Congress is indicative of its intent that the provisions of section 1372(e)(5) as they existed for the years in question be given the broad construction which the petitioners urge. If such had been the intent of Congress it is reasonable to conclude that it would have enacted the amendment with full retroactive effect.

In view of the above, it is our conclusion that East Gate's election to be treated as a small business corporation under subchapter S of

tangible personal assets) normally remain in interest-bearing accounts awaiting the subsequently required payments. The interest thus produced may well amount to more than 20 percent of a corporation's gross receipts particularly since its operating income may not yet have really begun to come in. Where this happens a corporation's 'passthrough' status may automatically terminate. This status then cannot generally be renewed for 5 years.

"To meet this type of problem, your committee's bill provides that a corporation is not to lose its 'passthrough' status merely because its passive investment income exceeds 20 percent of its gross receipts during the first two taxable years in which it carried on the active conduct of a trade or business if its passive investment income for the year in question is less than $3,000.

"This provision is to apply to corporate taxable years ending after the date of the bill's enactment. It is also to apply to earlier years beginning after December 31, 1962, at the election of the corporation if all persons who were shareholders at any time during those years consent to the application of this provision."

[5] Sec. 3(b) of Pub. L. 89–389, 80 Stat. 115, provides as follows:

"The amendment made by subsection (a) shall apply to taxable years of electing small business corporations ending after the date of the enactment of this Act. Such amendment shall also apply with respect to taxable years beginning after December 31, 1962, and ending on or before such date of enactment, if (at such time and in such manner as the Secretary of the Treasury or his delegate prescribes by regulations)—

"(1) the corporation elects to have such amendment so apply, and

"(2) all persons (or their personal representatives) who were shareholders of such corporation at any time during any taxable year beginning after December 31, 1962, and ending on or before the date of enactment of this Act consent to such election and to the application of the amendment made by subsection (a)."

the Code was terminated for its taxable year ended May 31, 1960, and for its succeeding taxable years and that, therefore, neither petitioner is entitled to deduct any part of East Gate's net operating losses under section 1374 of the Code. We therefore find it unnecessary to decide other issues relating to the amounts of East Gate's net operaing losses and the adjusted basis of the stock of petitioner Weldon F. Osborne in East Gate and the adjusted basis of any indebtedness of East Gate to him.

*Decision will be entered under Rule 50.*